# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

In re RELIANCE GROUP HOLDINGS, INC.　:　Master File No. 00-CV-4653 (TPG)
SECURITIES LITIGATION　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:

------------------------------------------------x

**PLAINTIFFS' MEMORANDUM SUBMITTED PURSUANT TO THE
COURT'S DIRECTIVE CONCERNING INSURANCE OWNERSHIP**

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
Robert A. Wallner
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300

BERGER & MONTAGUE, P.C.
Sherrie R. Savett
Phyllis M. Parker
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000

Plaintiffs' Co-Lead Counsel

Pursuant to the Court's directive at the December 12, 2003 conference, Lead Plaintiffs respectfully submit this memorandum to address the issue of the individual defendants' ability to use the proceeds of $125 million in outstanding insurance coverage to fund the proposed $17.4 million settlement of this action.

Plaintiffs understand that the $125 million consists of two tranches of insurance available to the settling individual defendants: (i) $25 million of insurance covering claims against the individual defendants, plus (ii) $100 million of insurance covering claims against the individual defendants and the now-bankrupt corporate entity, Reliance Group Holdings, Inc. ("RGH"), and its subsidiaries. With respect to the $25 million policy, there can be no serious dispute that those funds are more than sufficient to fund the proposed settlement. Moreover, even with respect to the additional $100 million in policies, the individual defendants, as insureds thereunder, may properly use the proceeds of those policies to fund the settlement. As set forth below, it is the individual insureds who have the rights against the policies and thus are "owners" of the insurance proceeds even if, technically, RGH actually purchased the policies in the first instance.

Instructive here is In re First Central Fin'l Corp., 238 B.R. 9 (Bankr. E.D.N.Y. 1999). In that case, the insurance policy provided coverage for claims against both the directors and officers and the corporate debtor in bankruptcy. Noting that no claims had been asserted against the debtor, and that there was no likelihood that the debtor would have to look to the insurance proceeds to cover claims against it, the court explained that the insurance coverage "cannot be used by a trustee to lever himself into a position of first entitlement to policy proceeds." Id. at 18. Accordingly, even if the insurance *policy* may be deemed to be "owned" by the debtor who purchased the policy, the "proceeds" do not belong to the debtor's estate. Id. at 16.

Similarly instructive is In re CHS Elecs., Inc., 261 B.R. 538 (Bankr. S.D. Fla. 2001). As the CHS court explained:

> the fact that CHS obtained and owns the Policies here is not determinative. Instead, the Court must focus on who has rights against the Proceeds.

Id. at 542 (citing First Central with approval). The court ruled that the proceeds of the policies -- which covered claims against the debtor's directors and officers (as well as against the debtor itself) -- could be used to fund any court-approved settlement between class action securities plaintiffs and the directors and officers. See id. at 545.

Judge Baer recently reached a similar result in In re Adelphia Communications Corp., 298 B.R. 49 (S.D.N.Y. 2003). There, individuals sought to use the proceeds of insurance policies -- which covered both directors and officers and the corporate debtor -- to pay for defense costs incurred in various lawsuits. The bankruptcy court, however, stayed the individuals' efforts to obtain the proceeds under the automatic bankruptcy stay, 11 U.S.C. § 362(a). On appeal, Judge Baer vacated the automatic stay, recognizing that the corporate debtor had no property interest in the proceeds that would abrogate the right of the other, non-debtor insureds to use the policies' proceeds. See 298 B.R. at 53-54 ("Without legal and equitable interest in the proceeds, Adelphia's estate cannot be ascribed to hold a property interest in these proceeds."). See also In re Daisy Sys. Secs. Litig., 132 B.R. 752, 754-55 (N.D. Cal. 1991) (withdrawing reference to the bankruptcy court, and noting that proceeds of the directors' and officers' liability policies "are not simply assets of Daisy's bankruptcy estate to be divided among creditors according to bankruptcy law.").

In this case, the individual defendants clearly "own" the $17.4 million in proceeds specifically set aside under the Funding Agreement (out of the $125 million in available insurance) to settle this litigation. That result follows even assuming, arguendo, that a liquidator

of a debtor (or, for that matter, anyone else) had potentially meritorious claims against the individual defendants. See In re CHS Elecs., 261 B.R. at 544 ("Simply because Cooper is a trustee in bankruptcy does not arm him with super-plaintiff powers in causes of actions between third parties."); In re Phar-Mor, Inc. Secs. Litig., 164 B.R. 903, 907-08 (W.D. Pa. 1994) (bankruptcy code "was not designed to destroy independent claims that the creditors and equity owners may have against non-bankruptcy entities, or place a higher priority on the Debtor's claim against such entities."); In re Daisy Sys. Secs. Litig., 132 B.R. at 756 ("If the 'Trustee's primary right to the insurance proceeds arises ... from Daisy's position as beneficiary of the derivative action,' then his interest is no greater than that of the class plaintiffs in the securities fraud case.") (ellipsis in original). In such a case, the liquidator would be "merely another litigant wishing to pursue claims against the Ds and Os," In re CHS Elecs., 261 B.R. at 544, with no rights better than those of other claimants, including the plaintiffs in this proceeding.

## CONCLUSION

For the foregoing reasons and those set forth in our prior papers, plaintiffs' motion to enforce the Memorandum of Understanding should be granted.

DATED:   New York, NY
December 18, 2003

Respectfully submitted,

MILBERG WEISS BERSHAD
HYNES & LERACH LLP

By:    _Robert A. Wallner_
Robert A. Wallner (RW 5109)

One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

-and-

- 3 -

BERGER & MONTAGUE, P.C.
Sherrie R. Savett
Phyllis M. Parker
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-3000
Facsimile:  (215) 875-4604

Plaintiffs' Co-Lead Counsel

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, 2003, I caused true and correct copies of the foregoing Plaintiffs' Memorandum Submitted Pursuant to the Court's Directive Concerning Insurance Ownership to be served by telecopy and U.S. Mail upon the following:

Eric S. Goldstein, Esq.
PAUL WEISS RIFKIND WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
    *Attorneys for Defendant Lowell Freiberg*

Steven E. Obus, Esq.
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
    *Attorneys for Defendant Saul P. Steinberg*

Alexander Kerr, Esq.
McCARTER & ENGLISH, LLP
1735 Market Street, Suite 700
Philadelphia, PA 19103
    *Attorneys for Defendant Robert M. Steinberg*

Joseph M. Smick, Esq.
SEDGWICK, DETERT, MORAN & ARNOLD
125 Broad Street, 39th Floor
New York, NY 10004
    *Attorneys for Lloyd's of London*

Anthony Vidovich, Esq.
BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103
    *Attorneys for M. Diane Koken,*
    *Liquidator of Reliance Insurance Company*

                         Robert A. Wallner

DOCS\167621v1

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE RELIANCE GROUP HOLDINGS, INC. SECURITIES LITIGATION | Master File No.: 00 Civ. 4653 (TPG) |

## DEFENDANT LOWELL C. FREIBERG'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE MEMORANDUM OF UNDERSTANDING AND SETTLEMENT FUNDING AND RELEASE AGREEMENT AMONG DEFENDANTS AND UNDERWRITERS

Eric S. Goldstein, Esq. (EG-1034)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Defendant Lowell C. Freiberg*

# TABLE OF CONTENTS

                                                                        **Page**

**Preliminary Statement** ..................................................................................... 1

**Background** ...................................................................................................... 5

**Argument** ....................................................................................................... 13

I.      D&O DEFENDANTS HAVE THE RIGHT, AS ASSUREDS, TO
        ACCESS THE POLICIES' PROCEEDS FOR COVERED CLAIMS .................. 13

        A.      Neither RIC's Liquidation Nor RGH's Bankruptcy Increases Those
                Entities' Rights — Or Abrogates The D&O Defendants' Rights — To
                Proceeds Of The Policies........................................................................ 14

        B.      The Liquidator's Tort Claims Against Certain Director And Officer
                Insureds Do Not Create Any Property Interest In The Proceeds Of The
                Policies.................................................................................................. 18

        C.      No Extraordinary Circumstance Exists That Could Conceivably Justify
                Interfering With The D&O Defendants' Rights Under The Policies ........ 21

**Conclusion** .................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

A.H. Robins Co., Inc. v. Puccini, 788 F.2d 994 (4th Cir. 1986) ........................................22

In re Adelphia Communications Corp., 2003 WL. 22005944
(S.D.N.Y. Aug. 25, 2003) ...............................................................................15, 16

Anglo-American Ins. Co. v. Molin, 670 A.2d 194 (Pa. Cmwlth. Nov. 6, 1995)...............17

Bohn v. Sentry Ins. Co., 681 F. Supp. 357 (E.D. La. 1988), aff'd, 868 F.2d 1269
(5th Cir. 1989) ...............................................................................................17n

In re CHS Electronics, 261 B.R. 538 (Bankr. S.D. Fla. 2001) ....................................20, 23

Country Mutual Ins. Co. v. Anderson, 257 Ill. App. 3d 73 (1 Dist. Nov. 24, 1993).......17n

In re Davis, 730 F.2d 176 (5th Cir. 1984) ...........................................................23n

In re First Central Financial Corp., 238 B.R. 9
(Bankr. E.D.N.Y. 1999)..................................................16n, 17n, 19, 20, 21, 22, 23

In re Gagnon, 26 B.R. 926 (Bankr. M.D. Pa. 1983) ............................................15

In re Granite Partners, L.P., 194 B.R. 318 (Bankr. S.D.N.Y. 1996) .........................16n, 22

In re Johns-Manville Corp., 33 B.R. 254 (Bankr. S.D.N.Y. 1983) .....................21, 22, 23n

Kaiser v. Monitrend Investment Management, Inc., 672 A.2d 359 (Pa. Cmwlth.
Jan. 31, 1996)................................................................................................14

In re Koreag, Controle et Revision, S.A., 961 F.2d 341 (2d Cir. 1992)............................15

In re The Leslie Fay Companies, Inc., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) .................24

In re Louisiana World Exposition, Inc., 832 F.2d 1391 (5th Cir. 1987) ...................16n, 20

In the Matter of the Liquidation of Midland Ins. Co., 167 A.D.2d 75 (1st Dep't
1991), aff'd, 79 N.Y.2d 253 (1992) .........................................................................14

Millers Mutual Ins. Assoc. of Illinois v. Shell Oil Co., 959 S.W.2d 864 (Mo. App.
E.D. Nov. 25, 1997)................................................................................17n

In re Moskowitz, 13 B.R. 357 (Bankr. S.D.N.Y. 1981) .................................................23n

In re Pearl-Wick Corp., 15 B.R. 143 (Bankr. S.D.N.Y. 1981), aff'd 697 F.2d 291
    & 295 (2d Cir. 1982) .............................................................................23n

Prudential Reinsurance Co. v. Superior Court, 3 Cal. 4th 1118 (Cal. Nov. 30,
    1992).................................................................................................14

In re Reliance Acceptance Group, 235 B.R. 548 (D. Del. 1999) ......................20

In re Royal Business School, Inc., 157 B.R. 932 (Bankr. E.D.N.Y. 1993).......15

In re Taylor, 23 B.R. 539 (Bankr. S.D. Ohio 1982) ......................................23n

Travelers Indem. Co. v. Citgo Petroleum Corp., 166 F.3d 761 (5th Cir. 1999)..............17n

Underwriters Guarantee Ins. Co. v. Nationwide Mutual Fire Ins. Co.,
    578 So. 2d 34 ....................................................................................17n

In re Village Rathskeller, Inc., 147 B.R. 665 (Bankr. S.D.N.Y. 1992) ............15

## FEDERAL STATUTES AND RULES

11 U.S.C. § 105..........................................................................................22

28 U.S.C. § 1441.........................................................................................11

28 U.S.C. § 1452.........................................................................................11

Federal Rule of Bankruptcy Procedure 9027.................................................11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE RELIANCE GROUP HOLDINGS,
INC. SECURITIES LITIGATION

Master File No.:
00 Civ. 4653 (TPG)

## DEFENDANT LOWELL C. FREIBERG'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE MEMORANDUM OF UNDERSTANDING AND SETTLEMENT FUNDING AND RELEASE AGREEMENT AMONG DEFENDANTS AND UNDERWRITERS

At the December 12, 2003 conference in the above-captioned matter, the Court requested briefing as to whether the individual director and officer defendants (the "D&O Defendants") can access the proceeds of certain insurance policies under which they are Assureds to fund the $17.4 million settlement of this action. Accordingly, D&O Defendant Lowell C. Freiberg ("Freiberg") respectfully submits this Supplemental Response To Plaintiffs' Motion To Enforce Memorandum Of Understanding And Settlement Funding And Release Agreement Among Defendants And Underwriters (the "Motion to Enforce").

### Preliminary Statement

D&O Defendants are former officers and directors of Reliance Group Holdings, Inc. ("RGH") and its subsidiaries. As such, they are named Assureds under relevant insurance policies which provide, in aggregate, $125 million in insurance coverage to RGH, its subsidiaries, and their current and former officers and directors (the "Policies").

On May 29, 2001, all defendants in this action – including RGH, against whom this matter is now automatically stayed under the Bankruptcy Code – entered into a Memorandum of Understanding (the "MOU") with plaintiffs to settle this action for

$17.4 million, payable entirely out of the Policies. Underwriters' obligation to fund the $17.4 million settlement from the Policies was contemporaneously memorialized in a Settlement Funding and Release Agreement with defendants. The MOU expressly provided for the possibility that corporate defendant RGH would enter into bankruptcy before the settlement could be finalized; in such circumstances, approval of the settlement would be sought from the bankruptcy court presiding over RGH's Chapter 11 case (the "RGH Bankruptcy Court").

Reliance Insurance Company ("RIC"), a subsidiary of RGH, is not a party to this action and, thus, was not a party to the MOU. Nevertheless, on June 4, 2001, RIC, through the Insurance Commissioner of Pennsylvania acting as statutory Rehabilitator of RIC, filed an Emergency Petition For Preservation of Insurance Policy Assets of Estate (the "Emergency Petition") in the Commonwealth Court of Pennsylvania seeking to block the settlement. In the Emergency Petition, the Rehabilitator (now, Liquidator) argued that the proceeds of the Policies were *exclusively* the assets of RIC's estate and that no other assured is entitled to coverage. Based on the argument that RIC is entitled to hoard *all* of the Policies' proceeds to satisfy its future claims against the Policies – to the complete exclusion of every other Assured – the Emergency Petition asked the Commonwealth Court to prohibit the parties from consummating the $17.4 million settlement. In response to the Emergency Petition, in July 2001, Underwriters stated that they would not make any payments under the Policies – notwithstanding their contractual obligations to pay covered claims, including this settlement – without prior approvals from the Liquidator, the Commonwealth Court *and* the RGH Bankruptcy Court.

- 2 -

In order to obtain a modest extension of time to respond to the Emergency
Petition, defendants and Underwriters agreed not to take any steps to consummate the
settlement until the merits of the Emergency Petition could be decided. However, the
merits of the Emergency Petition were never reached. In April 2003, after motion
practice which resulted in the Emergency Petition's transfer to the RGH Bankruptcy
Court, the Liquidator and the RGH Creditors' Committees agreed to stay the Emergency
Petition indefinitely.

Thus, for two and a half years, the Emergency Petition has been lying
dormant. And, as a result, the settlement of this action has been effectively blocked. No
court (until now) has had the occasion to consider that there are no grounds to interfere
with the D&O Defendants' rights as Assureds to have covered claims – including the
settlement of this action – paid from the Policies, and that the Liquidator's arguments to
the contrary are meritless.

*First*, the law is clear that neither liquidation nor bankruptcy increases an
entity's rights – much less eclipses those of others – in particular property. Thus, the
Liquidator (standing in the shoes of RIC) only has whatever rights RIC had pre-
liquidation – namely, the right to have covered claims processed and paid by
Underwriters from policies under which RIC is a co-insured in good faith and on a first-
come, first-served basis. Of course, the Liquidator has absolutely no rights to the
separate $25 M "Side A" policy reserved exclusively for officers and directors.

*Second*, the law is clear that an entity's status as a competing claimant –
whether or not that claimant is in bankruptcy or liquidation – does not create any property
right in the proceeds of a liability policy protecting its officers and directors. Here, the

- 3 -

Liquidator's remarkable claim that she has the right to block the settlement in *this case* is based on her status as a potential *claimant* to the Policies – having filed a lawsuit in 2002 against Reliance directors and officers in the Commonwealth Court – and *not* as a co-assured. Thus, the Liquidator seeks to commandeer the proceeds of the Policies, including those providing no coverage to RIC whatsoever, not to satisfy any covered claims against RIC but because she *hopes* to prevail in the later-filed Koken Action and will look to the Policies to satisfy any judgment or settlement therein.

*Third,* this case does not present the extraordinary situation in which judicial interference with assureds' contractual rights to insurance policy proceeds is necessary. The law is clear that courts need only insulate the proceeds of a policy claimed by a bankrupt entity where continued coverage of co-assureds will frustrate or thwart reorganization. That is certainly not the case here. On information and belief, this settlement would consume only 1/6 of the relevant Policies' available proceeds. Moreover, *in addition to* the $125 million in insurance proceeds represented by the relevant Policies, there is $90 million in insurance coverage available to assureds from reinstatements and other policies.

In sum, there is nothing in law or equity to justify interference with D&O Defendants' rights as Assureds to have covered claims – including the settlement of this action – paid from the Policies on a first-come, first-served basis.

# Background

<u>The Policies</u>

        The relevant Policies provide, in aggregate, $125 million in insurance coverage for D&O Defendants and other current and former officers and directors of RGH and its subsidiaries. The first $100 million (comprised of four layers) are blended policies that provide coverage not only to officers and directors, but also to RGH and its subsidiaries. The remaining $25 million – the "Side A Policy" – provides coverage exclusively to officers and directors and is designed to respond after the first $100 million in coverage has been exhausted or, if, for some reason, the first $100 million fails to respond.

        Specifically, the relevant insurance policies include:

(1)     a primary blended policy (covering up to $10 million in losses), bearing policy number FD9701593, providing coverage for Directors & Officers and Company Liability (subject to a $1 million deductible), Errors & Omissions (subject to a $2.5 million deductible), Employment Practices Liability (subject to a $1 million deductible) and Fiduciary Liability (subject to a $100,000 deductible);

(2)     a first layer ($20 million excess $10 million) blended excess policy, bearing policy number F01201D96, providing coverage for Directors & Officers and Company Liability, Errors & Omissions, Employment Practices Liability and Fiduciary Liability;

(3)     a second layer ($20 million excess $30 million) blended excess policy, bearing policy number F01307D97, providing coverage for Directors & Officers and Company Liability, Errors & Omissions, Employment Practices Liability and Fiduciary Liability;

(4)     a third layer ($50 million excess $50 million) blended excess policy, bearing policy number FD9798178, providing coverage for Directors & Officers and Company Liability, Errors & Omissions, Employment Practices Liability and Fiduciary Liability; and

(5)     a "Side A" Directors & Officers Policy, bearing policy number FD9900896, providing $25 million in coverage to directors and officers of RGH and its subsidiary companies.

- 5 -

(Insurance policies (1) – (5) collectively are referred to herein as the "Policies" and copies of the Policies are attached to the Affidavit of Eric S. Goldstein, sworn to January 15, 2004 ("Goldstein Aff."), as Exhibits A through E, respectively.)

The primary and excess blended policies ((1) – (4) above collectively, hereinafter referred to as the "Underlying Policies") have an aggregate coverage limit of $100 million. The "assureds" on the Underlying Policies (and with respect to each type of coverage provided) include RGH, its subsidiaries and their respective officers and directors.[1] The Underlying Policies obligate Underwriters to pay any "Loss" that an assured shall become legally obligated to pay with respect to a covered claim or to reimburse a company assured for its indemnification of its officers and directors with respect to covered losses. (*See* Goldstein Aff., Ex. A at p. 15.) "Loss" is defined to include damages, settlements and legal fees and expenses incurred in defending or investigating a covered claim. (*See* Goldstein Aff., Ex. A at pp. 2 – 3.)

The different types of coverage provided by the Underlying Policies are subject to various deductibles (*i.e.*, "self-insured-retentions"). However, the $1 million deductible applicable to D&O claims (*i.e.*, claims against directors and officers based on alleged wrongdoing by them while acting in that capacity) specifically does not apply to claims by officers and directors for losses incurred by them for which they have *not* received indemnification from RGH or its subsidiaries – such as the covered $17.4

---

[1]   RGH is the named insured with respect to the Underlying Policies, and RIC – like the officers and directors – is defined as an assured based on its relationship to RGH. The Underlying Policies define "Assureds" as "the Company and the Directors and Officers"; the "Company" is further defined as the "Parent Company and any Subsidiary"; and the "Parent Company" is defined as "Reliance Group Holdings, Inc." (*See* Goldstein Aff., Ex. A at pp. 2-3.)

million loss presented by the settlement of this action. (*See* Goldstein Aff., Ex. A at pp. 14-15.)

The $100 million in aggregate coverage provided by the Underlying Policies covers a four-year term, ending December 31, 2001, and is provided on a "claims-made" basis. On information and belief, approximately $10 million of this has been paid in settlement and defense fees and costs. (*See* Goldstein Aff. ¶ 3.) Additional unpaid defense bills for officers and directors remain pending. In addition, on December 24, 2003, the parties in an ERISA case pending in the Eastern District of Pennsylvania, as well as Underwriters and the Liquidator, entered into a settlement agreement providing for a $5 million payment out of the Underlying Policies to settle claims against several Reliance officers and directors. (*See* Goldstein Aff. ¶ 4.)

The Side A Policy provides an additional $25 million in coverage dedicated exclusively to losses that "Directors and Officers" of RGH and its subsidiaries become legally obligated to pay as a result of a claim alleging wrongdoing by such officer or director while acting in that capacity. (*See* Goldstein Aff., Ex. E.) An officer or director may seek payment for such losses under the Side A Policy where (i) the limit of liability (*i.e.*, $100 million) of the Underlying Policies has been exhausted; (ii) the loss is not payable under the Underlying Policies; (iii) the Underwriters of the Underlying Policies are financially unable to pay the claimed loss; or (iv) the Underwriters of the Underlying Policies wrongfully refuse to pay the claimed loss. (*See* Goldstein Aff., Ex. E

at p. 2.)[2]  On information and belief, no payments have been made from the Side A

Policy.  (*See* Goldstein Aff. ¶ 5.)

The MOU

On May 29, 2001, the parties agreed to settle this action pursuant to the

terms of the MOU for $17.4 million.  (*See* MOU, attached to the Affidavit of Phyllis M.

Parker In Support of Plaintiffs' Motion to Enforce, sworn to September 22, 2003 ("Parker

Aff."), as Ex. A.)  Accompanying the MOU are several side agreements.  Of these side

agreements, the Settlement Funding and Release Agreement between defendants and

Underwriters is the most relevant to Plaintiffs' Motion to Enforce.  (*See* Parker Aff., Ex.

B.)  In the Settlement Funding and Release Agreement, Underwriters "agree and commit

to fund the [$17.4 million] Settlement Amount" from the Policies.  (*See* Parker Aff., Ex.

B at p. 2.)  The pertinent terms of the MOU are as follows:

- Defendants shall cause their insurance carriers ("Underwriters") to pay
  to the Class (subject to any remaining self-insured retention, which, if
  any, the Company shall pay), in settlement of the claims against
  Defendants, the sum of Seventeen Million and Four Hundred
  Thousand Dollars ($17,400,000) (the "Settlement Amount") (*see*
  MOU at ¶ 2);

- In the event that a bankruptcy petition is filed by or against Reliance
  before the District Court's judgment approving the Settlement shall
  have become final after all appeals (or petitions for certiorari) or
  before the time for all such appeals (or petitions) shall have expired,
  Reliance shall move expeditiously for approval by the bankruptcy
  court in which the Reliance bankruptcy is pending of (a) the
  Stipulation of Settlement and (b) the Settlement Funding and Release
  Agreement dated May 29, 2001 between the Defendants and the

---

[2]  The MOU and accompanying Settlement Funding and Release Agreement were
intended to settle plaintiffs' securities claims against all defendants in this action,
including RGH.  Thus, the $17.4 million settlement payment from Underwriters was
to be paid entirely out of the Underlying Policies, which provide both entity and
D&O coverage – not the Side A Policy.

Underwriters (the "Underwriters' Agreement"). The parties shall use their best efforts to obtain bankruptcy court approval of both (a) and (b) of this paragraph 4, and bankruptcy court approval of each will be conditions precedent to the Settlement (*see* MOU at ¶ 4); and

- Subject to paragraph 4, above, all applications to the Court with respect to any aspect of this Settlement shall be presented to and determined by United States District Judge Allen G. Schwartz (the "Court") (*see* MOU at ¶ 7).

## The Liquidator Files The Emergency Petition To Block The Settlement Of This Action

Five days after the MOU was signed, the Insurance Commissioner of Pennsylvania in her capacity as Rehabilitator (now, the "Liquidator") of RIC, filed the Emergency Petition in the Commonwealth Court of Pennsylvania.[3]  In the Emergency Petition, the Rehabilitator contended that the Policies from which the settlement of this action is to be funded were wholly assets of RIC's estate and subject to the Rehabilitation (now, Liquidation) Order of the Commonwealth Court, which enjoins all persons having possession of RIC's assets from disbursing, disposing of or utilizing such assets in any way. (*See* Emergency Petition at ¶ 15.)  While the Rehabilitator acknowledged that the Policies provide coverage to parent company RGH, all of its subsidiaries, and each of their respective officers and directors (*id.* at ¶ 10), the Rehabilitator argued that RIC's entry into rehabilitation somehow nullified the rights of all other assureds under these Policies and subjected the Policies to the Rehabilitator's unilateral control. The Emergency Petition specifically opposed any use of the Policies to "effectuate or consummate any settlement" of this action. (*See* Emergency Petition, at p. 10.)

---

[3]   The Emergency Petition is attached as Exhibit 1 to the Affidavit of William P. Campos, sworn to October 10, 2003, submitted by Underwriters in opposition to plaintiffs' motion seeking joinder of Underwriters.

- 9 -

In the Emergency Petition, the Rehabilitator did not express concern that continued coverage of co-insureds under the Policies would somehow prejudice RIC's rights as an assured. Indeed, the Rehabilitator did not invoke a single covered loss or threatened loss for which RIC would claim coverage as an assured under the Policies. In fact, the Emergency Petition made clear that the Rehabilitator was seeking to protect her interests as a potential *claimant* to the proceeds of these Policies, rather than to protect RIC's interest as an *assured* under the Policies. In that regard, in June 2002, the Liquidator filed a breach of fiduciary duty action in the Commonwealth Court against Reliance officers and directors (the "Koken Action"). The Liquidator will seek to recover for any judgments or settlements in the Koken Action from the Policies.

On June 5, 2001, given the exceedingly short notice (less than 48 hours) provided by the Emergency Petition,[4] counsel for RGH and the D&O Defendants and Underwriters' counsel entered into a stipulation (the "June 5 Stipulation") with Rehabilitator's counsel extending the hearing date on the Petition for 30 days or until the matter could be heard and agreeing to take no further action to "effectuate or consummate" the settlement of the Securities Class Action during such period. The June 5 Stipulation was entered by the Commonwealth Court on June 8, 2001. (*See* June

---

[4]    Counsel for the Rehabilitator served the Emergency Petition on counsel for RGH (in New York) and Underwriters (in San Francisco) by fax, without supporting exhibits, on the afternoon of June 4, 2001. A full set of the papers was not received by counsel until June 5, 2001. Nevertheless, the Rehabilitator requested, and obtained, from the Commonwealth Court a hearing on the matter scheduled for June 6, 2001 at 10 a.m.

5, 2001 Stipulation Adjourning and Extending Hearing Date Of Emergency Petition and June 8, 2001 Order, attached to the Parker Aff. as Exs. C and D, respectively.)[5]

On June 29, 2001, RGH debtor's counsel removed the Emergency Petition to the United States Bankruptcy Court for the Eastern District of Pennsylvania, pursuant to Federal Rule of Bankruptcy Procedure 9027 and 28 U.S.C. §§ 1441 and 1452, and filed a motion to transfer the Emergency Petition to the RGH Bankruptcy Court. On July 12, 2001, the Rehabilitator filed a motion seeking remand or abstention. By Opinion and Order dated February 22, 2002, the Eastern District of Pennsylvania Bankruptcy Court granted RGH's motion to transfer the Emergency Petition to the RGH Bankruptcy Court, and denied the Rehabilitator's motion for remand or abstention. (*See* February 22, 2002 Opinion and Order, attached to the Parker Aff. as Ex. F.)

Since then, the Emergency Petition has remained pending in the RGH Bankruptcy Court. However, its merits have never been briefed or adjudicated. Instead, it has been stayed indefinitely. In an April 1, 2003 Settlement Agreement, the Liquidator and the Official Unsecured Bank and Creditors' Committees of RGH and Reliance Financial Services Corp. (the "RGH Creditors' Committees") agreed to take no "action,

---

[5]   In forwarding the June 8, 2001 Order, the Commonwealth Court sent a cover letter addressed to counsel, stating its position as follows: "[F]rom this date forward, any actions which would either directly or indirectly negatively impact or diminish the assets of the Reliance Insurance Company must be approved not only by the Insurance Commissioner of the Commonwealth [*i.e.*, the Rehabilitator], but also by the Commonwealth Court of Pennsylvania." (*See* June 8, 2001 Letter from The Honorable James Gardner Colins to G. Craig Lord, Jerome R. Richter and Brad S. Karp, attached to the Parker Aff. as Ex. D.) Since that time, in light of the June 5, 2001 Stipulation, the June 8, 2001 Order and the accompanying June 8, 2001 Letter from the Commonwealth Court, and out of an abundance of caution, D&O Defendants have been constrained in taking any steps to proceed with this settlement.

- 11 -

in any court or other tribunal, that seeks any ruling or order of any kind with respect to the subject matter of the Emergency Petition [which is described as "pending in the [RGH] Bankruptcy Court"] until such time as the parties agree to a dismissal or other resolution of the matter." (*See* April 1, 2003 Settlement Agreement at ¶4(e), attached to the Affidavit of William P. Campos, sworn to October 17, 2003 ("Second Campos Aff."), as Ex. 2.)  The Liquidator also agreed to share any recovery in the Koken Action (including from the Policies) with the RGH Creditors' Committees. (*See* Second Campos Aff., Ex. 2 at ¶ 4(a) and (b).)  The April 1, 2003 Settlement Agreement was approved by the RGH Bankruptcy Court and the Commonwealth Court. (*See* Second Campos Aff., Exs. 3 and 4.)  However, as this Court pointed out at the December 12, 2003 conference, plaintiffs, D&O Defendants and Underwriters are not parties to the April 1, 2003 Settlement Agreement.

Underwriters Refuse To Honor Their Contractual Obligations To Pay Covered Claims

In response to the Emergency Petition, on July 23, 2001, Underwriters announced that they would not make any payments from the Policies – notwithstanding their contractual obligations to pay covered claims, including this settlement – unless various "conditions precedent" were met.  Specifically, Underwriters stated that "at least the following will be required as conditions precedent to payment under any of the policies":  (1) approval of such payment by the Rehabilitator (now, Liquidator); (2) approval of such payment by the Commonwealth Court; and (3) approval of such payment by the RGH Bankruptcy Court.  With respect to the "required" approvals from the RGH Bankruptcy Court and the Commonwealth Court, Underwriters stated that "payment will only be made after the approval orders are final and non-appealable." (*See*

- 12 -

July 23, 2001 Letter from Eugene V. Elsbree, III to Gregory Candela, attached to the Parker Aff. as Ex. E.) None of these "conditions precedent" is contained in the terms of the Policies. However, as a practical matter, Underwriters' refusal to fund the settlement absent the aforementioned approvals has blocked the resolution of this action.

## Argument

## I.

## D&O DEFENDANTS HAVE THE RIGHT, AS ASSUREDS, TO ACCESS THE POLICIES' PROCEEDS FOR COVERED CLAIMS

The law is clear that neither liquidation nor bankruptcy increases an entity's property rights, much less eclipses those of others, in particular property. Thus, RGH in bankruptcy and RIC in liquidation have only those rights to the Policies that RGH and RIC had pre-bankruptcy and pre-liquidation: namely, with respect to the Underlying Policies, the right to have covered claims processed and paid by Underwriters in good faith and in a non-discriminatory fashion; and, no rights whatsoever to the proceeds of the Side A Policy. Moreover, the fact that the Liquidator has filed claims against director and officer insureds and hopes to recover for those claims from the Policies neither increases her property interests nor diminishes the rights of D&O Defendants in the Policies.

Only in extraordinarily rare circumstances – where massive depletion of estate assets threatens a debtor's reorganization – have courts interfered with assureds' rights to coverage under a D&O policy by extending the bankruptcy stay to insulate the policy's proceeds. Such circumstances do not remotely exist here. Indeed, this settlement would consume, on information and belief, less than 1/6 of available proceeds from the Policies. And, *in addition to* the relevant $125 million Policies, there is $90

- 13 -

million in insurance coverage available to assureds from reinstatements and other policies. Moreover, RIC is not in reorganization but is in liquidation; and it is clear that the Liquidator seeks to block this settlement not to satisfy pending claims against RIC but because she hopes to recover from the Policies for her own claims against Reliance officers and directors.

Accordingly, there are no legal or equitable grounds to justify interfering with D&O Defendants' rights as Assureds to access the Policies' proceeds for covered claims -- including the settlement of this action.

A.    **Neither RIC's Liquidation Nor RGH's Bankruptcy Increases Those Entities' Rights — Or Abrogates The D&O Defendants' Rights — To Proceeds Of The Policies**

When RIC entered rehabilitation, and subsequently liquidation, the Rehabilitator/Liquidator stepped into the shoes of RIC. The property interests of RIC in Rehabilitation/Liquidation include only those rights that it held prior to such rehabilitation or liquidation. *See, e.g., Kaiser* v. *Monitrend Investment Management, Inc.*, 672 A.2d 359, 364 n.5 (Pa. Cmwlth. Jan. 31, 1996) ("[T]he Statutory Liquidator has no greater rights under the contract than the [insolvent insurer] and would be subject to any defenses that may be asserted against the [insolvent insurer] by the other party to the contract."); *In the Matter of the Liquidation of Midland Ins. Co.*, 167 A.D.2d 75, 80-81 (1st Dep't 1991) ("[I]t is black letter law in New York, that the Liquidator steps into the shoes of the insolvent insurer assuming all its rights and subject to all the defenses and set-offs the insurer was subject to at the time of the insolvency. Consequently, liquidation orders do not magically change the nature of debts and obligations in the ordinary case."), *aff'd*, 79 N.Y.2d 253 (1992); *see also Prudential Reinsurance Co.* v.

- 14 -

*Superior Court*, 3 Cal.4[th] 1118, 1136-37 (Cal. Nov. 30, 1992) ("It is well settled that once insolvency has occurred and a liquidator has been appointed to assume all the rights of the insolvent insurer, he does so subject to *all* legal defenses and setoffs to which the insolvent was subject at the time of insolvency and liquidation orders. In other words, the liquidator steps into the shoes of the insolvent insurer, taking the relevant claims and defenses as he finds them." (emphasis in original)).

Similarly, in bankruptcy, the debtor's estate includes only those legal or equitable interests of the debtor that existed prior to bankruptcy. Bankruptcy does not enlarge a debtor's rights in property beyond those existing at commencement of the bankruptcy case. *See In re Koreag, Controle et Revision, S.A.*, 961 F.2d 341, 349 (2d Cir. 1992) ("Property interests have an independent legal source, antecedent to the distributive rules of bankruptcy administration, that determines in the first instance the interests of claimant parties in particular property."); *In re Royal Business School, Inc.*, 157 B.R. 932, 941-42 (Bankr. E.D.N.Y. 1993) (debtor's rights in escrow account no greater than those existing at commencement of bankruptcy case); *In re Village Rathskeller, Inc.*, 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992) ("To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate."); *see also In re Gagnon*, 26 B.R. 926, 928 (Bankr. M.D. Pa. 1983) ("the estate's legal and equitable interests in property rise no higher than those of the debtor").

Recently, in *In re Adelphia Communications Corp.*, 2003 WL 22005944 (S.D.N.Y. Aug. 25, 2003), the court considered whether Adelphia, a Chapter 11 debtor, could claim a property interest in the proceeds of policies providing both entity and D&O coverage merely by virtue of having gone into bankruptcy and without having made any

- 15 -

payments for which it would be entitled to reimbursement from the policies. Judge Baer concluded that bankruptcy did not bestow Adelphia with extra-contractual rights to insurance policy proceeds, even though each dollar paid out of the policies for attorneys' fees, settlements or judgments on behalf of an insured officer or director left one dollar less for future payments to the debtor under the policies. Judge Baer reasoned:

> Claiming the debtors now have a property interest in those proceeds makes no sense at this juncture. Such argument would be akin to a car owner with collision coverage claiming he has a right to proceeds from his policy simply because there is a prospective possibility that his car will collide with another tomorrow, or a living person having a death benefit policy, and claiming his beneficiaries have a property interest in the proceeds even though he remains alive. No cognizable equitable and legal interest in the proceeds from the D&O policies has arisen here. Without legal and equitable interest in the proceeds, Adelphia's estate cannot be ascribed to hold a property interest in those proceeds.

*Adelphia*, 2003 WL 22005944, at *3.[6]

So too here. The Underlying Policies are blended policies that provide coverage to RGH and RIC, as well as directors and officers, subject to a single coverage

---

[6]    Like *Adelphia*, other courts have found that liability proceeds due to individual insureds on covered claims are <u>not</u> assets of the debtor's estate, even where a D&O policy provides some coverage to the debtor. *See, e.g., In re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir. 1987) (only directors and officers to whom D&O liability coverage is payable, and not debtor, have a property interest in such proceeds, even where debtor purchased policy on their behalf and obtained indemnity coverage under same policy); *In re First Central Financial Corp.*, 238 B.R. 9 (Bankr. E.D.N.Y. 1999) (adopting holding of *Louisiana World* even where subject D&O policy provided debtor with indemnification and entity coverage for securities actions); *In re Granite Partners, L.P.*, 194 B.R. 318 (Bankr. S.D.N.Y. 1996) (proceeds of D&O policy, also providing indemnification coverage to debtor, were not property of estate so as to trigger automatic stay of pending claims against individual insureds and court would not extend stay).

- 16 -

limit. Thus, payment of covered losses to one co-insured under these Underlying Policies reduces, dollar for dollar, the amount of coverage available to other co-insureds in the event they sustain covered losses.[7] But the rights of multiple co-insureds in a single-limit policy is simply the right to have Underwriters administer the policy and pay covered losses, as presented, in good faith and in a non-discriminatory manner.[8] As the *Adelphia* court made clear, neither liquidation nor bankruptcy gives the Liquidator or RGH legal or equitable interests in the Policies' proceeds that trump the rights of other co-assureds to have claims paid from the Policies on a first-come, first-served basis.

Indeed, in the absence of bad faith, insurers may *exhaust* policy proceeds in order to consummate a reasonable settlement on behalf of one insured, even where such settlement payment would leave co-insureds with little or no coverage. *See Anglo-American Ins. Co.* v. *Molin*, 670 A.2d 194, 198-99 (Pa. Cmwlth. Nov. 6, 1995) (in the absence of bad faith, insurer could accept reasonable settlement offer on behalf of less than all insureds even where settlement would leave co-insured co-defendants with little remaining coverage).[9]

---

[7]  Under a multi-insured policy with a single coverage limit, such as the Underlying Policies, "payment under the policy is normally provided on a first-come, first-served basis and each such payment reduces the total amount of coverage available to pay claims." *In re First Central Financial Corp.*, 238 B.R. 9, 14 (Bankr. E.D.N.Y. 1999).

[8]  By contrast, because the Side A Policy *only* provides liability coverage for losses incurred *directly* by directors and officers of RGH and its subsidiaries and provides *no* coverage to RGH or any subsidiary, neither RGH nor RIC (before or after their respective bankruptcy and rehabilitation/liquidation) has any property interest in the $25 million Side A proceeds whatsoever.

[9]  *See also Travelers Indem. Co.* v. *Citgo Petroleum Corp.*, 166 F.3d 761, 764-66 (5th Cir. 1999) (dismissing non-settling insured's breach of contract claim against insurer for exhausting policy limits on behalf of co-insured; insurer may proceed with a reasonable settlement once a settlement demand is made, even if settlement

- 17 -

Here, far from exhausting policy proceeds, the $17.4 million settlement would expend, on information and belief, less than 1/6 of the available coverage from the relevant $125 million Policies. Furthermore, effective January 26, 2001, there is an *additional* $90 million in insurance coverage available to assureds from $20 million reinstatements of the first and second excess layers of the Underlying Policies and $50 million in other insurance policies. (*See* Goldstein Aff., Ex. B at Endorsement Number 12, Ex. C at Endorsement Number 13, Ex. F and Ex. G.)

In sum, neither RGH's bankruptcy nor RIC's liquidation provide any basis to interfere with the D&O Defendants' rights, as Assureds, to the Policies' proceeds.

## B. The Liquidator's Tort Claims Against Certain Director And Officer Insureds Do Not Create Any Property Interest In The Proceeds Of The Policies

It is clear from the Emergency Petition and the later-filed Koken Action, that the Liquidator seeks complete control over the Policies' proceeds based on her status as a potential *claimant*, and *not* as a co-insured, on the Underlying Policies. (Indeed, this

---

eliminates — or reduces to level insufficient for further settlement — coverage for co-insured); *Bohn* v. *Sentry Ins. Co.*, 681 F. Supp. 357, 365 (E.D. La. 1988), *aff'd*, 868 F.2d 1269 (5th Cir. 1989) (automobile insurer not required to provide additional insured with defense once it settled claims against named insured for policy limits, absent finding that insurer acted in bad faith); *Millers Mutual Ins. Assoc. of Illinois v. Shell Oil Co.*, 959 S.W.2d 864, 867 (Mo. App. E.D. Nov. 25, 1997) (liability insurer not obligated to defend additional insured under liability policy after policy limits had been exhausted in settlement on behalf of co-insured); *Country Mutual Ins. Co.* v. *Anderson*, 257 Ill. App. 3d 73 (1 Dist. Nov. 24,1993) (rejecting additional insured's argument that insurer owed it a continuing duty to defend after insurer had settled claim against a co-insured for policy limits); *Underwriters Guarantee Ins. Co.* v. *Nationwide Mutual Fire Ins. Co.*, 578 So.2d 34, 35-36 (Fla. App. 4 Dist. April 17, 1991) (insurer extinguished its duty of defense by, in good faith, paying policy limits and securing release of its named insured, even though action remained pending against additional insured).

would explain the Liquidator's attempt to commandeer the Side A Policy, which provides no coverage whatsoever to RIC.) But the law is crystal clear that an entity's status as a competing claimant – whether or not the claimant is bankrupt or in rehabilitation/liquidation – does not create a property interest in the proceeds of a liability policy protecting its officers and directors.

On this point, *In re First Central Financial Corp.*, 238 B.R. 9 (E.D.N.Y. 1999), is instructive. There, the Chapter 7 Trustee sought to enjoin officers and directors from obtaining payment under a D&O policy purchased by the debtor for legal fees and liability in connection with shareholder class actions, and for legal fees in connection with an action by the Trustee then pending against them. The Trustee sought to reserve the policy proceeds for future satisfaction of the Trustee's own claims against the directors and officers. The D&O policy at issue did not simply provide liability coverage to the officers and directors; it also provided indemnification and some liability coverage to the debtor. However, the Court noted that there was no realistic risk that claims against the debtor would implicate the liability coverage, or substantially impact the estate. (*See id.* at 17-18, 20.) Thus, the Court concluded that the Trustee was attempting improperly to protect the estate's interests as a competing claimant, not to protect its interests as a co-insured:

> The thrust of this adversary proceeding is the Trustee's efforts to insulate Policy proceeds from distribution to any outside interest, primarily the Plaintiffs in the [shareholder action] and the Officers and Directors. The Trustee would thus have first crack at the D&O Policy proceeds.

*Id.* at 15.

- 19 -

The *First Central* court rejected the Trustee's effort, ruling that the contingent tort claims of the bankruptcy estate had no right to precedence over those of any other claimant, and refused to bar disbursement of the D&O proceeds to pay directors' and officers' covered losses in both the shareholders' and Trustee's actions. *Id.* at 17-21. "If entity coverage is hypothetical and fails to provide some palpable benefit to the estate, it cannot be used by a trustee to lever himself into a position of first entitlement to policy proceeds." *Id.*, at 18. *See also In re Louisiana World Exposition*, 832 F.2d 1391 (5th Cir. 1987) (debtor's pending tort claim against officers and directors did not permit debtor to interfere with insurers' payment of directors' and officers' legal expenses from D&O policy, also providing indemnification coverage to debtor, even though payment of legal expenses might result in insufficient remaining coverage to satisfy potential damage award in favor of debtor); *In re CHS Electronics*, 261 B.R. 538, 540-41 (Bankr. S.D. Fla. 2001) ("Neither the Bankruptcy Code nor applicable law gives [the Trustee] any right to delay the settlement of a lawsuit by third parties against a debtor's former officers and directors merely because [the Trustee] also has presently unliquidated claims against those officers and directors," even where judgment obtained by Trustee "could exceed the remaining Proceeds if the Class Action Settlement is approved and funded"; rejecting Liquidating Trustee's objection to settlement of class action against directors and officers of debtor funded by $11.75 million out of $20 million D&O policy, also providing indemnification and entity coverage to debtor); *In re Reliance Acceptance Group*, 235 B.R. 548, 561 (D. Del. 1999) (concluding that debtors "have been unable to identify a legal principle that stands for the proposition that the

Estate's claims for relief should take precedence over the Shareholders' [non-derivative] claims" against officers and directors).

Thus, the Liquidator's unliquidated claims against the directors and officers in the Koken Action provide no justification for her interference with – and Underwriters' refusal to honor – the D&O Defendants' rights as Assureds under the Policies.

### C.  No Extraordinary Circumstance Exists That Could Conceivably Justify Interfering With The D&O Defendants' Rights Under The Policies

Payments to co-insureds under a policy with a single coverage limit is "normally provided on a first-come, first-served basis." *First Central*, 238 B.R. at 14. Courts have only interfered with a co-insured's independent rights under a policy in extraordinarily limited circumstances, wholly inapplicable here. For example, in *In re Johns-Manville Corp.*, 33 B.R. 254 (Bankr. S.D.N.Y. 1983), approximately 1,000 tort actions alleging asbestos injury were pending against the debtor, its officers, directors and employees implicating insurance policies providing coverage to the debtor as well as the individual defendants. This avalanche of asbestos litigation (representing potentially $2 billion in liability – far in excess of available insurance) prompted Manville to file for bankruptcy in order to formulate a bankruptcy plan that would provide reasonable compensation to all asbestos victims. *Id.* at 267-68.

In these circumstances, the Manville Bankruptcy Court found that the proceeds of all insurance policies covering Manville and its officers, directors and employees were "absolutely necessary for the formulation of any reorganization plan." *Id.* at 267; *see also id.* at 268 ("To provide this reasonable compensation, the [debtor's]

- 21 -

estate must include all of the insurance policies and proceeds so that all asbestos litigants can be fairly compensated . . .".) The Court thus used its broad power under Section 105(a) of the Bankruptcy Code to extend the automatic stay so as to enjoin all actions of "any type against present, former or future officers, directors or employees of Manville or any of its corporate entities." *Id.* at 263. *See also First Central*, 238 B.R. at 19 (distinguishing bankruptcy cases – including *A.H. Robins Co., Inc.* v. *Puccini*, 788 F.2d 994, 999, 1008 (4th Cir. 1986) and *In re Johns-Manville Corp.*, 33 B.R. 254 (Bankr. S.D.N.Y. 1983) – which stayed actions against debtor's officers and directors as "unique circumstances" involving mass litigation that would result in "a massive depletion of estate assets" needed to consummate reorganization and divert key personnel from formulating plan of reorganization); *In re Granite Partners, L.P.*, 194 B.R. at 338 (denying trustee's motion to enjoin actions by investors against debtor's officers and directors where trustee could not demonstrate "that the continuation of these lawsuits will frustrate or thwart the reorganization because of their effect on [debtor's] insurance coverage, or for any other reason.").

As the *First Central* and *Granite Partners* courts explained, a court should only seek to insulate the proceeds of a policy in which the debtor is a co-insured where continued coverage of other insureds "will frustrate or thwart the reorganization," *Granite Partners*, 194 B.R. at 338, such as "when many and/or large entity coverage claims against the debtor threaten to become a 'free-for-all' that might exhaust the

insurance proceeds and thereby jeopardize estate assets over and above the limits of the policy," *First Central*, 238 B.R. at 17.[10]

   Here, there is no "mass litigation" against RGH or RIC that threatens to exhaust the policy proceeds and frustrate reorganization. Indeed, on information and belief, consummation of this settlement would consume only 1/6 of the available proceeds from the relevant Policies. Furthermore, in addition to the $125 million in insurance coverage relevant to this action, there is an additional $90 million in insurance coverage available to assureds from reinstatements and other policies. *Cf. CHS*

---

[10] None of the bankruptcy cases cited by the Rehabilitator (now Liquidator) in support of the Emergency Petition is to the contrary. Those cases either do not involve the separate rights of co-insureds to policy proceeds or involve unusual circumstances where the debtor's reorganization would be so threatened by payments from the policies to co-insureds that the court has extended the automatic stay to insulate co-insureds from litigation that would otherwise implicate the policies. *See, e.g., In re Davis*, 730 F.2d 176 (5th Cir. 1984) (approving Johns-Manville bankruptcy court's authority to extend automatic stay to 279 personal asbestos injury suits against debtor's executives and insurers); *In re Johns-Manville Corp.*, 33 B.R. 254 (Bankr. S.D.N.Y. 1983) (extending automatic stay to 1,000 pending cases against debtor's officers, directors and employees implicating insurance policy proceeds); *In re Taylor*, 23 B.R. 539 (Bankr. S.D. Ohio 1982) (debtors, and not trustee, entitled to keep $30,000 in insurance proceeds received as a result of loss and damage to personal property which debtors had properly claimed as exempt at the time they filed for bankruptcy; rights of co-insureds not at issue); *In re Pearl-Wick Corp.*, 15 B.R. 143 (Bankr. S.D.N.Y. 1981), *aff'd* 697 F.2d 291 & 295 (2d Cir. 1982) (provision of agreement, in which corporation acquiring all outstanding corporate stock of debtor's corporate parent agreed to maintain in force and effect a policy on the life of a director and officer of the debtor payable to the debtor's corporate parent to secure any unpaid balance owed the owners and sellers of debtor's corporate parent, did not constitute an assignment of the policy; thus, the policy was the property of the debtor's estate and the debtor, as the designated beneficiary, was entitled to the proceeds; rights of co-insureds not at issue); *In re Moskowitz*, 13 B.R. 357 (Bankr. S.D.N.Y. 1981) (proceeds that medical liability insurer contractually owed to debtors as medical insurance constituted "property of the estate" sufficient for trustee to state a claim that payment of the proceeds by the insurer directly to a hospital on the debtor's behalf is a voidable preference; rights of co-insureds not at issue).

*Electronics*, 261 B.R. at 544 (refusing to enjoin $11.75 million settlement of claims against directors and officers even though settlement would utilize more than 50% of a $20 million D&O policy also providing indemnification and liability coverage to debtor); *In re The Leslie Fay Companies, Inc.*, 207 B.R. 764, 786 (Bankr. S.D.N.Y. 1997) (refusing to enjoin settlement on behalf of directors and officers even though settlement would use more than 50% of D&O policy providing indemnification coverage to debtors). Thus, as in *First Central* and *Granite Partners*, there is no basis to abrogate the D&O Defendants' right to coverage, or to disturb the normal, "first-come, first-served" payment of covered claims.

\*     \*     \*

In sum, there are no grounds – in law or equity – that would justify abrogating the D&O Defendants' rights, as Assureds, to have covered claims – including the settlement of this action – paid from the Policies.

**Conclusion**

For the foregoing reasons, Freiberg respectfully submits that D&O

Defendants have the right, as Assureds, to access the Policies' proceeds for covered

claims.

Dated: New York, New York
       January 16, 2004

                                  PAUL, WEISS, RIFKIND,
                                    WHARTON & GARRISON LLP

                           By: _____
                                    Eric S. Goldstein (EG-1034)
                                    Liza M. Velazquez (LV-7221)
                                    Daniel J. Juceam (DJ-1256)

                           1285 Avenue of the Americas
                           New York, New York  10019-6064
                           (212) 373-3000

                           *Attorneys for Lowell C. Freiberg*

TO:

**VIA FEDERAL EXPRESS**          **VIA HAND DELIVERY:**
**OVERNIGHT DELIVERY:**

| | |
|---|---|
| Sherrie R. Savett, Esquire<br>Phyllis M. Parker, Esquire<br>**BERGER & MONTAGUE, P.C.**<br>1622 Locust Street<br>Philadelphia, PA 19103<br>*Co-Lead Counsel for Securities Class*<br>*Action Plaintiffs* | Robert A. Waller, Esquire<br>**MILBERG WEISS BERSHAD HYNES**<br>**& LERACH LLP**<br>One Pennsylvania Plaza<br>New York, NY 10119-0165<br>*Co-Lead Counsel for Securities Class*<br>*Action Plaintiffs* |
| Alexander Kerr, Esquire<br>Lisa M. Salazar, Esquire<br>**McCARTER & ENGLISH, LLP**<br>1735 Market Street, Suite 700<br>Philadelphia, Pennsylvania 19103<br>*Attorneys for Defendant*<br>*Robert M. Steinberg* | Steven E. Obus, Esquire<br>Lisa A. Bauer, Esquire<br>**PROSKAUER ROSE LLP**<br>1585 Broadway<br>New York, New York 10036<br>*Attorneys for Defendant*<br>*Saul P. Steinberg* |
| Anthony Vidovich, Esquire<br>**BLANK ROME, LLP**<br>One Logan Square<br>Philadelphia, Pennsylvania 19103-6998<br>*Attorneys for Insurance Commissioner of*<br>*Pennsylvania M. Diane Koken, In Her*<br>*Capacity As Liquidator of Reliance*<br>*Insurance Company* | Joseph M. Smick, Esquire<br>**SEDGWICK, DETERT, MORAN &**<br>**ARNOLD**<br>125 Broad Street, 39th Floor<br>New York, New York 10004-2400<br>*Attorneys for Lloyds Underwriters* |

- 26 -