# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

RELIANCE GROUP HOLDINGS, INC.
SECURITIES LITIGATION

MASTER FILE NO.
00-CV-4653 (TPG)

## UNDERWRITERS' MEMORANDUM
## CONCERNING INSURANCE POLICY OWNERSHIP

This Memorandum is submitted on behalf of the those certain Underwriters at Lloyd's,
London and other companies ("Underwriters), joined to this action for the limited purpose of
Plaintiffs' Motion to Compel Enforcement of a Settlement Memorandum of Understanding
pursuant to the Court's November 18, 2003 Order. As requested at the Court's December 12,
2003 conference, Underwriters submit this Memorandum addressing the question as to whether
Underwriters' insurance policies are assets of the insolvent estates of Reliance Group Holdings
("RGH") and Reliance Insurance Company ("RIC"). Although no court has yet decided whether
Underwriters' policies are property of either the RGH or RIC insolvency estates, it is
Underwriters' view that the operative policies applicable to the settlement MOU are indeed
assets of both estates.

## SUMMARY OF THE POLICIES

At issue are five separate insurance policies various Underwriters issued to RGH.[1] Four
of the policies provide "blended" coverage, each in turn providing four separate and individual

---

[1] Given the nature of underwriting through Lloyd's, London, the actual insurers subscribing to each different policy
are different. Put differently, different Syndicates at Lloyd's and other companies subscribed to different
percentages of the risk on each of the policies.

types of coverage. The last policy provides coverage to the directors and officers of RGH and its subsidiaries alone.

## A.    The "Blénded" Policies

The "Blended Policies," listed below, are so named because each singular policy actually consists of four separate types of coverage. Each of the following Blended Policies contains the following coverage sections: (a) Directors, Officers and Company Liability Coverage; (b) Errors & Omissions Coverage; (c) Fiduciary Liability Coverage; and (d) Employment Practices Coverage:

| Policy Number | Aggregate Limit of Liability |
|---|---|
| 823/FD9701593 | $10.0 million |
| 542/F01201D96 | $20.0 million, excess of $10.0 million |
| 823/F01307D97 | $20.0 million, excess of $30.0 million |
| 823/FD9798178 | $50.0 million, excess of $50.0 million |

Generally speaking, the Directors, Officers and Company Liability Coverage Section ("D&O Coverage Section") provides coverage for any "Wrongful Acts" committed by the directors and officers of RGH or its subsidiaries. When RGH or RIC can indemnify the directors/officers pursuant to state law or the corporation's own charter or by-law provisions, Underwriters reimburse the corporations for such indemnity. If the corporations cannot indemnify the directors/officers, however, Underwriters provide direct coverage to the individuals.

Atypical of traditional directors and officers policies, however, the D&O Coverage Section also provides coverage to RGH (and RIC, as its subsidiary) for "Securities Claims" asserted against the corporations themselves. The instant securities class action lawsuit is such a

2

securities claim and, consequently, RGH as well as the individual director/officer defendants named were considered "Assureds" under the Blended Policies.

The Blended Policies provide additional coverage to various Assureds. In summary, coverage is afforded for acts, errors or omissions: (1) committed in the performance of "Professional Services" (the Errors & Omissions Coverage section); (2) constituting breaches of fiduciary duties under the Employee Retirement Security Income Act of 1974 (the Fiduciary Liability Coverage section); and (3) relating to employment relationships (the Employment Practices Coverage section). Summarizing the various coverage sections, the following are considered "Assureds" under the Blended Policies:

| Coverage Section | Assured (Person/Entity Covered) |
|---|---|
| D&O | directors/officers of RGH and RIC |
| | RGH and RIC, to the extent they indemnify their directors/officers |
| | RGH and RIC itself, for "Securities Claims" |
| E&O | RGH, RIC, directors/officers and employees |
| Fiduciary | Benefit Programs sponsored by RGH, as well as their fiduciaries, trustees, directors, officers and employees |
| Employment Practices | RGH, RIC, their directors, officers, employees and certain non-employees |

Although each of the four separate coverage sections has a separate and distinct limit of liability, each policy also has an aggregate limit of liability. Once the aggregate limit of liability

3

is paid, regardless of the coverage sections under which the monies were disbursed, the policy

coverage ceases.[2]

Finally, the Blended Policies cover not only the ultimate liabilities, but also the costs,

expenses and fees incurred in the defense of Assureds. Defense costs and fees apply to satisfy

any deductible obligations, as well as reduce the aggregate limit of liability.

**B.    The "Side A Policy"**

Unlike the Blended Policies referenced above, various Underwriters also issued a

separate policy protecting only the directors and officers of RGH and its corporate subsidiaries.

Commonly referred to as a "Side A Policy," policy number 823/FD9900896 responds to

potential liabilities of the directors/officers only, and only when (a) the aggregate limits of the

Blended Policies have been exhausted; or (b) when the claim is not payable or covered by the

Blended Policies, but is otherwise covered under the terms of the Side A Policy. Importantly,

neither RGH nor RIC are considered "Assureds" for any purpose. Put simply, neither RGH nor

RIC are covered under the Side A Policy.

When the Side A Policy was originally issued, it provided $25.0 million of coverage

excess to the $100.0 million afforded under the Blended Policies. The term of the Side A Policy

was July 29, 1999 to December 31, 2001. As of January 26, 2001, however, the Side A Policy

was amended so as to provide $25.0 million of coverage excess $125.0 million for claims made

during the period of January 26, 2001 through December 31, 2001. On information and belief,

RGH has purchased another insurance policy (effective January 26, 2001) from Greenwich

Insurance Company, which provided $25 million of coverage excess the $100.0 million afforded

under the Blended Policies.

---

[2] Though not of any relevance to the current proceeding, under certain circumstances the aggregate limits of
liability for the first ($20.0 million excess $10.0 million) and second ($20.0 million excess $30.0 million) excess
policies are susceptible to replenishment, or "reinstatement."

The Side A Policy is not applicable to the settlement contemplated by the MOU. First, and perhaps most obviously, the prerequisites to coverage under the Side A Policy have not been implicated. The limits of the Blended Policies have not been exhausted, and the $17.4 million settlement is covered and payable under the Blended Policies (the only issue being obtaining the necessary approvals from the RGH and RIC estates, if required, to make such payments), Second, however, the Side A Policy provides no coverage for the liabilities of RGH itself. Underwriters to the Side A Policy will not pay the entire $17.4 million settlement consideration when, as contemplated in the MOU, the settlement was to include to co-defendant RGH as well.

## C.    Premium Payments

Although the name and address of the "Assured" on the declaration page of each policy is listed as RGH, Underwriters have been advised that the premium payments for each of the policies was in fact paid by Reliance National Insurance Company, a subsidiary of (and eventually merged into) RIC. The premium payments were then reallocated, internally, between RIC, RGH and the other corporate RGH subsidiaries insured under the policies.

## D.    Coverage Submissions

The instant securities class action (which, as pointed out in Underwriters' past briefs, includes a related derivative action styled *Leibowitz v. Saul Steinberg, et al.*[3]) was submitted to Underwriters as a claim under the various policies. It is not, however, the only lawsuit or circumstance which has been tendered for coverage. Certain Assureds have publicly disclosed the existence of the following lawsuits, also submitted for coverage under the policies:

---

[3] As this Court is aware, the contemplated settlement reflected in the MOU was to not only resolve the plaintiff class action litigation, but the *Leibowitz* derivative action as well. After RGH filed for bankruptcy, the derivative action was removed to the United States Bankruptcy Court for the Southern District of New York, and is currently pending before the Honorable Arthur J. Gonzalez as adversary proceeding number 01-02829, relating to In Re Reliance Group Holdings, Inc., bankruptcy case number 01-13404. The bankruptcy court subsequently held that the original plaintiffs were no longer proper parties to prosecute the derivative action, and stayed the proceeding so as to allow RGH or its creditor committees to decide whether to pursue the action further.

- Camille LaManna, et al. v. Saul P. Steinberg, et al., E.D. Pa. C/A No.: 01CV3571

- Frank Dalicandro v. Legalgard, Inc., et al., Pa. C.P. C/A No. 99CV3778 and Frank Dalicandro v. Reliance Insurance Company, Inc., et al., Bankr. E.D. Pa. adv. proceeding number 03-162, relating to In Re Sandenhill, Inc., bankruptcy no. 02-11232[4]

- Mario Vitale v. Reliance Group Holdings, Inc., et al., N.Y. Sup. Index No. 602651/00 and Eugene Pittelli v. Reliance Group Holdings, Inc., et al., N.Y. Sup. Index No. 602499/01

- M. Diane Koken v. Saul P. Steinberg, et al., Pa. Commw. C/A No. 421MD2002

Notably, while the *LaManna* and *Koken* actions do not assert liabilities against RGH or RIC, the *Vitale* and *Dalicandro* adversary actions are still viable matters against RGH and RIC.

RIC has also submitted notification of other lawsuits, as well as circumstances which may give rise to future lawsuits, in certain bordereau lists tendered to Underwriters. Since these lists contain non-public information, Underwriters would be willing to produce them subject to adequate safeguards and protections, such as to the Court for *in camera* inspection. Those matters do involve potential liabilities of RIC.

## ANALYSIS

1.  ### The Policies are Likely Assets of the RGH and RIC Estates.

"Because corporations pay for and own insurance policies, courts considering the question have concluded that the policies are property of the estate pursuant to 11 U.S.C. § 541(a)(1)." Ochs v. Lipson (In re First Central Financial Corp.), 238 B.R. 9, 15-16 (Bank. E.D.N.Y. 1999), *aff'd in an unreported opinion*, No. 99-CV-6730 (E.D.N.Y. Mar. 2, 2000) ("*First Central*"). This axiom, as characterized by the *First Central* Court, is an "unstated

---

[4] Underwriters have not yet opined as to whether the post-expiry adversary action is "related" to the prior *Dalicandro* action and, as such, entitled to coverage.

given," since the corporation purchased the policy, and in most cases is also the beneficiary of the coverage. Id. Section 541(a)(1) of the United States Bankruptcy Code considers property of the estate to be "all legal or equitable interests of the debtor in property as of the commencement of the case." Id. See also In Re Adelphia Communications Corp. v. Associated Electric & Gas Insurance Services (In re Adelphia Communications Corp.), 285 B.R. 580, 590 (Bank. S.D.N.Y. 2002), vacated 298 B.R. 49 (S.D.N.Y. 2003), on remand 2003 WL 22945634 (Bankr. S.D.N.Y Dec. 5, 2003)("Adelphia")(a copy of the Adelphia remand opinion is appended to this Memorandum). As RGH purchased the Blended Policies to provide coverage, at least in part, for itself, the Blended Policies are likely assets of the RGH bankruptcy estate.

On May 29, 2001, the Insurance Commissioner of Pennsylvania obtained an order placing RIC into rehabilitation. Consistent with statutory obligations, the Commonwealth Court of Pennsylvania ordered the Rehabilitator to take immediate possession of RIC's assets. See 40 P.S. § 221.15(c) (a rehabilitation order shall direct the rehabilitator to forthwith take possession of the insurer's assets, and administer them under orders of the court). The Insurance Department of Pennsylvania exercised similar rights, pursuant to court order, when RIC was later placed into liquidation. See 40 P.S. § 221.20(c) (liquidator is to take possession of the insurer's assets). "Assets" of the RIC estate are defined, under the Pennsylvania insurance statute, as:

> all property, real, personal, or otherwise, not specifically mortgaged, pledged, deposited, or otherwise encumbered for the security or benefit of specified persons or classes of persons. As to specifically encumbered property, "general assets" includes all such property or its proceeds in excess of the amount necessary to discharge the sum or sums secured thereby. Assets held in trust and on deposit for the security or benefit of all policyholders and creditors shall be treated as general assets.

40 P.S. § 221.3. The Pennsylvania insurance statutes therefore parallel the bankruptcy code definition of estate "assets" or property, and it would appear that RIC (or the Pennsylvania Insurance Commissioner) could viably assert that the Blended Policies are assets of the RIC estate as well. This seems especially true since RIC is a covered "Assured" under the Blended Policies, and paid the premiums for the policies.

Actions, however, speak louder than conjecture. As this Court is aware, the Pennsylvania Insurance Commissioner has in fact asserted that the Blended Policies (as well as the Side A Policy) are assets of the liquidation estate. Underwriters respectfully direct the Court to the Honorable Kevin J. Carey's opinion in M. Diane Koken v. Reliance Group Holdings, Inc. (In re Reliance Group Holdings), 273 B.R. 374 (Bankr. E.D. Pa. 2002)("*Reliance Group Holdings*"), which outlines in detail the Pennsylvania Insurance Commissioner's assertions in this regard. The *Reliance Group Holdings* Court did not, however, finally resolve this issue, as the motion addressed only the forum for future decision (the Insurance Commissioner seeking remand to the Pennsylvania state court, while RGH sought transfer to the federal bankruptcy court in New York).[5] The Court will recall that, at the December 12, 2003 conference, counsel for the Pennsylvania Insurance Commissioner advised that an appeal had been taken to the *Reliance Group Holdings* decision, but that the appeal was stayed in some fashion.

In sum, the *Reliance Group Holdings* Court apparently assumed, without holding, that the policies were assets of the RGH estate. It similarly noted, again without holding, that the policies were claimed to be assets of the RIC estate as well. In light of the fact that both insolvent companies paid the premiums for coverage that, at least in significant part, provided corporate coverage to them, it is Underwriters' view under the relevant federal bankruptcy and

---

[5] The *Reliance Group Holdings* decision also outlines RIC's opposition to Underwriters' commitment to pay the $17.4 million settlement; the very same settlement Plaintiffs now move this Court to compel enforcement. *Reliance Group Holdings*, 273 B.R. at 380, fn. 8.

8

Pennsylvania insurance statutes that the policies are likely assets of both estates. Approval from each of the respective estates, confirmed by orders from the respective courts overseeing the insolvencies, would therefore appear necessary before policy monies can be paid.

**2.** **It is Uncertain Whether A Distinction Can Be Made Between the "Policies" and the "Proceeds" as Assets of the Estates.**

Given the traditional nature of directors and officers ("D&O") liability insurance (where a company purchases insurance intended to benefit its directors and officers), some courts have differentiated between "ownership of the policy" (as an asset of the bankrupt company) and entitlement to policy proceeds. In their Memorandum, the Plaintiffs have directed the Court to the most recent – and comprehensive – decision on this dichotomous point: the *Adelphia* decision. Plaintiffs' Memorandum Submitted Pursuant to the Court's Directive Concerning Insurance Ownership, at pp. 1-2. Underwriters acknowledge the principle adopted by these courts, they do not believe that the logic applies to the Blended Policies. Although Plaintiffs' cited to the District Court's opinion in *Adelphia*, a fuller analysis of the underlying bankruptcy court's original decision, and the outcome on remand, is illuminating.

**A.    The Original *Adelphia* Bankruptcy Court Decision**

In his well-reasoned and extensive discussion of D&O policies, the Honorable Robert F. Gerber of the United States Bankruptcy Court for the Southern District of New York addressed the policy/proceeds question in *Adelphia*. 285 B.R. at 590-91. Starting with the fundamental proposition that the D&O policies at issue were presumed to be property of the bankrupt estate, Judge Gerber noted that "courts are in disagreement as to whether insurance *proceeds* – as contrasted to the policy itself – are property of the estate." Id. (emphasis in original). Surveying the various court decisions to date, including the *First Central* case, the bankruptcy court noted that the answer to this question was dependent upon whether the insolvent corporation had a

9

"material interest in the proceeds of the D&O policy for its own economic exposure." Id., at 591. Thus, if the estate has no claim to coverage, the D&O proceeds are not considered property of its bankruptcy estate. Moreover, when the estate has only a theoretic right to coverage but no claims triggering that coverage have been made, the estate does not have a sufficient enough interest so as to render the proceeds as part of the estate. When, however, the estate is a covered beneficiary of the policy, and has a material interest in the D&O policy proceeds for its own economic exposure, the proceeds – like the policy itself – are considered property of the estate. Id.

Applying that framework, the bankruptcy court noted that the D&O policies at issue provided coverage not only to the directors and officers of the debtor corporation, but also (a) reimbursed the debtor corporation for its indemnification, pursuant to corporate charter or by-laws, of the directors and officers, and (b) so-called "entity coverage," which afforded the debtor corporation direct coverage for liability arising from violations of the securities laws.[6] These facts, alone, suggested that the policy proceeds (like the policy itself) should be considered property of the estate and subject to the automatic stay. Id., at 591-92. Noting that the debtor was acting as a "debtor-in-possession," the bankruptcy court also found compelling the assertion that directors and officers might be unwilling to serve the reorganizing company without preservation of the policy proceeds. Id., at 592. Because the debtor estate was "worth more with the D&O Policy by reason of the entity coverage and the need for the policy itself to secure independent directors," the proceeds of the policy were considered property of the estate. Id., at 593. Thus, relief from the automatic stay was required before any policy monies could be paid.

---

[6] The Adelphia bankruptcy court contrasted the existence of securities claim "entity coverage" in the First Central case. Although entity coverage existed under the First Central policies, the First Central court had noted that for the 18 months the debtor corporation had been in bankruptcy, no such securities claims had been asserted. Moreover, no one had threatened to institute such an action. The First Central court viewed the direct coverage to be "hypothetical." 285 B.R. at 580, fn. 27.

The bankruptcy court then took up the issue of relief from stay. Already finding that the policy and its proceeds were assets of the debtor corporation, the court considered the competing interests of the non-debtor directors and officers to access the policies for payment of defense costs, from that of the company itself. Id., at 596-600. After canvassing the various decisions from other jurisdictions, and recognizing that there was no clear cut answer, the bankruptcy court "balanced" the competing claims so as to allow the insurers to pay up to $300,000 per director and officer for their defense costs and fees, without prejudice to making further payment requests in the future. Id., at 600. The bankruptcy court also stayed a declaratory judgment action the D&O insurers had filed against the directors and officers only. Id., at 600-01.

B.    The *Adelphia* District Court Appeal

The individual directors and officers of Adelphia appealed that part of the bankruptcy court's decision staying the coverage litigation. *Adelphia*, 298 B.R. 49 (S.D.N.Y. 2003). The Honorable Harold Baer, Jr. vacated the bankruptcy court's decision, and remanded the case for further consideration. As to whether a coverage action between the D&O insurers and the Adelphia directors and officers should be stayed, Judge Baer first recognized, as did the bankruptcy court, that "it is well settled that insurance *policies* are covered by the automatic stay provisions of the Bankruptcy Code." 298 B.R. at 52 (emphasis in original). Judge Baer then addressed, however, whether the *proceeds* of the D&O policy were property of the estate so as to warrant a stay of the coverage action. Id., at 53.

Recognizing that there was no controlling Second Circuit precedent, the district court analyzed the company's rights to coverage under Adelphia's D&O policies. Turning to the debtor company's rights to coverage if it indemnified the directors and officers, Judge Baer noted that there were no suggestions that Adelphia had, or would, extend such indemnity

11

protection to the individuals. Id., at 53. Nor had the debtors made or committed themselves to seeking payments under the so-called entity securities claim coverage. Id. The district court found that "[n]o cognizable equitable or legal interest in the proceeds from the D&O policies has arisen here [and] [w]ithout legal and equitable interest in the proceeds, Adelphia's estate cannot be ascribed to hold a property interest in those proceeds." Id., at 53-54.

Lacking a current, cognizable debtor interest in the policies, the district court held that the automatic stay did not extend to coverage litigation between the non-debtor directors and officers on the one hand, and the D&O insurers on the other. The bankruptcy court did have the power to issue other orders, principally injunctions, to suits that may "threaten or thwart the debtor's reorganization efforts." Id., at 54. Determining that the bankruptcy court had provided no supported findings as to how, or why, the narrow litigation between the directors/officers and insurers would have an immediate, adverse economic consequence on the debtor, the stay of the coverage action was vacated and the case remanded. Id., at 55.

Underwriters highlight two points as to the district court's decision. First, at issue was the limited question of whether the automatic stay applied to coverage litigation between Adelphia's directors/officers and the D&O insurers. The corporate debtors were not parties to that suit and, as such, the decision principally addresses the breadth of the automatic stay. Second, however, Judge Baer was extremely critical of the suggestion that the Adelphia D&O policy proceeds were in fact property of the estate, given the only hypothetical rights to direct corporate coverage.

C.    The Adelphia Bankruptcy Court Remand

On remand, Judge Gerber articulated – in a lengthy opinion – the particular findings supporting an injunction on certain aspects of the coverage litigation, but otherwise allowing the

proceeding to continue. *Adelphia*, 2003 WL 22945634 (Bankr. S.D.N.Y. Dec. 5, 2003). In so doing, the bankruptcy court noted that:

> [t]he District Court agreed with this Court's determination that the D&O Policies were property of the estate. But impliedly disagreeing with the cases upon which this Court had relied; considering other cases to hold to the contrary; and stating that the issue was one of first impression in the Second Circuit, the District Court reversed this Court's legal determination that under the facts of these cases (where the D&O Policies provided both indemnification and entity coverage, and uncontrolled access to proceeds would effectively destroy the policies for [the debtor company]), the proceeds were property of the estate.

Id., at *7. Expressing strong criticism of the district court's logic, but deemed bound by the higher court's decision,[7] the bankruptcy court found that a stay of the coverage litigation was unnecessary in that the directors and officers had voluntarily agreed to limit their policy proceed payment requests to the $300,000 outlined in the original bankruptcy court decision. Id., at 12. All other aspects of the coverage litigation were stayed. Id.

### D.  Implications of *Adelphia*

As pointed out above, there exists an unresolved question in the Second Circuit as to whether a distinction can be made be made between D&O policies, and the proceeds of those policies, being considered property of a corporate bankrupt's estate. Even if such a dichotomy exists, the *Adelphia* decisions confirm that a reviewing court (in most instances, the bankruptcy court overseeing the bankruptcy process) must consider whether the corporate debtor is entitled to coverage for its own liabilities. If the debtor is entitled to coverage, and that coverage reflects a material economic interest (as opposed to pure speculation or hypothetical involvement), the proceeds are considered property of the estate as well.

---

[7] In a lengthy footnote, the bankruptcy court pointed out the numerous decisions holding that estate property is broadly construed, and the fact-based decisions arising under D&O policies where the corporate debtor had no interest in the policies. *See* 2003 WL 22945634, fn. 38 and accompanying text.

In the instant case, Underwriters point out three reasons why this policy/proceeds distinction is irrelevant.

First, the case decisions have been limited to D&O policies. This is perhaps understandable, as D&O insurance is generally considered to inure to the benefit of corporate directors and officers. Thus, when a corporation is bankrupt, but the directors and officers face continuing liability, a measuring and balance of the competing interests takes place. The *Adelphia* court wrestled with this point, given the indemnification and securities claim coverage which directly protected the estates themselves.

The Blended Policies, however, are not pure D&O policies. While one coverage part does indeed provide somewhat "traditional" D&O protection (with the additional protection, as in *Adelphia*, to the corporate entity for securities claims), there are three other coverage sections that respond to claims against the RGH and RIC estates. While one can understand why only the D&O Coverage Section is being considered for purposes of the instant action (as the other coverage parts do not respond to the Plaintiffs' suit nor the derivative action), the Blended Policies were written as singular, unitary contracts containing aggregate limits of liability. Underwriters' policies provide greater coverage, beyond mere director/officer indemnification and entity securities claim coverage, and the interests of the estates in the proceeds are not merely hypothetical given the existence of this and other actions.

On this point, Underwriters are aware that suggestions have been made that the Pennsylvania Insurance Department, on behalf of RIC, has interposed itself in an effort to derail this settlement so as to maximize the amount of policy proceeds potentially available to satisfy settlements or judgments of the lawsuit it filed against RGH and RIC directors and officers (the *Koken* action referenced above). The *First Central* decision, as well as the other decisions cited

14

in the Plaintiffs' Memorandum, focus on the principle that a trustee, liquidator or other debtor representative should not utilize the insolvency processes (and claim that policies are property of estate so as to stay disbursements) in order to artificially prioritize claims. As the Pennsylvania Insurance Department, or Liquidator of RIC, has not appeared before this Court to explain their actions, the true motives may not be known. Underwriters merely point out that there are other actions against RIC pending, and tendered for coverage, under the policies. Put differently, while it is true that the RIC has initiated an action against certain Assureds that may result in policy monies being paid (and RIC may therefore be considered but another claimant/plaintiff suing Assureds), so too is it equally true that RIC has been named in pending and threatened actions where, like RGH and the individual directors/officers here, it may be entitled to coverage under the Blended Policies in its own right.

Second, and perhaps most obvious, this recognition of coverage for RGH itself is one of the fundamental premises of the settlement Plaintiffs now seek to enforce. RGH was named as an actual defendant to the underlying securities class action, and is a signatory to the MOU. The settlement contemplated under the MOU obligates the plaintiffs not only to release RGH, but RGH in turn to (a) release the directors and officers for the derivative *Leibowitz* action, and (b) release Underwriters from any further responsibilities for the submitted litigation. This is a (pre-petition) claim that has been asserted against RGH, implicating very real coverage under the policies, and culminating in payment of policy proceeds if the settlement is consummated. Unlike the ethereal entitlements to prospective coverage for securities claims chided in the various court opinions, the property (and rights) of the RGH debtor estate stand front row center with regard to the MOU settlement: rights that include payments under the policies specifically

covering RGH itself, and relinquishment of corporate rights against its own directors and officers.[8]

Finally, there remains fundamental, unsettled questions as to whether the Blended Policies themselves (as opposed the proceeds), are property of either or both the RGH and RIC estates. *See Reliance Group Holdings*, 273 B.R. 374. Neither RGH nor RIC have appeared before this Court on that issue. Nor have the courts overseeing the insolvency estates been called upon to determine whether the Blended Policies are, or are not, property of their own respective estates.

---

[8] It is conceivable, for example, that RGH may avoid the obligations under the pre-petition MOU. As pointed out in the original *Adelphia* bankruptcy court decision, entity securities coverage is "rarely meaningful in bankruptcy cases (even in chapter 11 cases), because under section 510(b) of the [Bankruptcy] Code, claims for securities fraud . . . are subordinated to claims that are senior or equal in priority, and since there are rarely enough assets to pay all creditors in full, debtors are rarely in a position (and do not have a need) to make distributions on more junior claims." *Adelphia*, 285 B.R. at 592, fn. 13. The RGH estate may elect not to participate in the settlement, and see estate property denuded by junior claims. Similarly, RGH may now be unwilling to release derivative claims against its own directors/officers, including those set forth in the *Leibowitz* action. Like RIC, RGH's motives and positions are not known: it is not now before this Court, though RGH bankruptcy court approval is one of the conditions to the settlement.

16

## CONCLUSION

For the foregoing reasons, Underwriters believe that the Blended Policies would likely be considered property of the RGH and RIC insolvency estates. Moreover, although some courts have distinguished insurance *proceeds* from the *policies* themselves, Underwriters believe that the proceeds – especially in the context of Plaintiffs' submitted motion to compel enforcement of the MOU – would likely be considered property of both estates. Neither the federal bankruptcy court nor the Pennsylvania Commonwealth Court, or any court for that matter, has yet to decide whether and to what extent Underwriters' policies (or proceeds thereunder) are estate property.

Dated: New York, New York
      January 16, 2004

Respectfully Submitted,

SEDGWICK, DETERT, MORAN & ARNOLD LLP

By:
    Joseph M. Smick (JS 5895)
    Attorneys for Underwriters at Lloyd's, London
      and other companies
    125 Broad Street, 29th Floor
    New York, New York 10004-2400
    Telephone: (212) 422-0202
    Facsimile: (212) 422-0925

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January, 2004, I cause a true and correct copy of the foregoing Underwriters' Memorandum Concerning Insurance Policy Ownership to be served by telecopy and first class U.S. Mail upon the following:

Robert A. Wallner, Esq.
MILBERG WEISS BERSHAD HYNES & LERACH LLP
One Pennsylvania Plaza
New York, New York 10119
   *Plaintiffs' Co-Lead Counsel*

Sherrie R. Savett, Esq.
BERGER & MONTAGUE, P.C.
1622 Locus Street
Philadelphia Pennsylvania 19103
   *Plaintiffs' Co-Lead Counsel*

Eric S. Goldstein, Esq.
PAUL WEISS RIFKIND WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
   *Attorneys for Defendant Lowell Freiberg*

Steven E. Obus, Esq.
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
   *Attorneys for Defendant Saul P. Steinberg*

Alexander Kerr, Esq.
MCCARTER & ENGLISH, LLP
1735 Market Street, Suite 700
Philadelphia, Pennsylvania 19103
   *Attorneys for Defendant Robert M. Steinberg*

Anthony Vidovich, Esq.
BLANK ROME LLP
One Logan Square
Philadelphia, Pennsylvania 19103
   *Attorneys for M. Diane Koken, Insurance Commissioner of Pennsylvania and Liquidator
   of Reliance Insurance Company*

Joseph M. Smick (JS 5895)

18

## CERTIFICATE OF SERVICE

I, Anthony Vidovich, certify that on this day a true and correct copy of the Status Report of the Liquidator of Reliance Insurance Company, with exhibits, was served on all persons listed on the attached service list by either hand-delivery or over-night courier.

ANTHONY VIDOVICH

Dated: January 30, 2004

## SERVICE LIST

Eric S. Goldstein, Esquire
Liza M. Velazquez, Esquire
PAUL WEISS RIFKIN WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
**Attorneys for Class Action Defendant Lowell
Freiberg**

Steven E. Obus, Esquire
Lisa A. Bauer, Esquire
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036
**Attorneys for Class Action Defendant
Saul P. Steinberg**

Alexander Kerr, Esquire
Lisa M. Salazar, Esquire
McCARTER & ENGLISH, LLP
1735 Market Street
Suite 700
Philadelphia, PA  19103
**Attorneys for Defendant
Robert M. Steinberg**

Andrew DeNatale
Jack Rose
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036-2787
**Attorneys for the Official Unsecured Bank
Committee**

Arnold Gulkowitz
ORRICK HERRINGTON & SUTCLIFFE
666 Fifth Ave.
New York, NY  10103-0001
**Attorneys for the Official Unsecured
Creditors Committee**

Sherrie R. Savett, Esquire
Phyllis M. Parker, Esquire
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
**Co-Lead Counsel for Securities Class Action
Plaintiffs**

Robert A. Wallner, Esquire
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
One Pennsylvania Plaza
New York, NY  10119-0165
**Co-Lead Counsel for Securities Class Action
Plaintiffs**

Joseph M. Smick, Esquire
SEDGWICK, DETERT, MORAN &
  ARNOLD
125 Broad Street - 39th Floor
New York, NY  10004-2400
**Attorneys for Lloyds Underwriters**

Lorna G. Schofield
DEBEVOISE & PLIMPTON
919 Third Avenue
New York, NY  10022
**Attorneys for Debtor Reliance Group
Holdings, Inc.**

James M. Matour
HANGLEY ARONCHICK SEGAL &
PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA  19103
**Attorneys for Debtor Reliance Group
Holdings, Inc.**